All right, welcome back. Fourth and final case, 23-10-645, Villarino v. Pacesetter. Mr. Frisch here for the appellants, Mr. Tomasi here for the appellee. Mr. Frisch, whenever you're ready. Thank you, Your Honor. May it please the Court, I represent the plaintiffs in this case and I respectfully request that the Court reverse the District Court's rulings, three distinct rulings. Excuse me. The first one being that Pacesetter's deductions for mandatory transportation costs associated with using its comprehensive employee transportation system to the extent they brought my client's wages below minimum wage does not violate the FLSA. The second issue being the treatment of travel time and pre-travel time, waiting time as non-compensable under the FLSA and the Florida Minimum Wage Act. And the third one being the deny of class certification related to charges of over $3 per day pertaining to the transportation in violation of the Florida Labor Pool Act. I think the original sin here or the biggest issue with regard to the summary judgment, as we briefed, is the way in which the Court resolved the motions for summary judgment. Here, the parties had cross-motions for summary judgment, as the Court's aware. The plaintiffs moved for summary judgment on several grounds under the FLSA. The defendants cross-moved on several grounds, although those grounds did not include the issue of whether the cost of the comprehensive employee transportation system violated the minimum wage provisions of the FLSA. The Court issued an order on plaintiffs' motion for summary judgment denying it. And as it was supposed to, it viewed the facts in the light most favorable to the defendants, the non-movements. There was then a delay in resolving the defendants' motion for summary judgment. And almost immediately after the defendants filed a notice advising the Court that their motion remained pending, the Court, what appeared to be hurriedly, issued an order granting the defendants' motion for summary judgment in part on the FLSA claims. And in large part, it relied on and adopted both its factual findings on plaintiffs' motion for summary judgment, in which it was taking the facts in light most favorable to Paysetter, the defendants, the non-movement, and the law as well. The law part is a different issue. I will address that. But the factual issues that permeate are reason alone for the reversal. There are critical factual issues that the Court viewed in light of Paysetter in the context of the Paysetter motion for summary judgment that by itself require reversal with relation to the cost issue. Let me ask you this just really quickly. So this seems like a little bit different than the argument that I took you to be featuring in the briefs. In the briefs, I took you to be making kind of a, like, we had no notice kind of argument. And now you seem to be saying it's really about sort of the failure to take the facts in the light most favorable or something like that. Are you sticking by the no notice and opportunity to respond argument? I don't think the no notice argument is so critical. I think there's a part and parcel of the same argument. I think what happened here was because the Court didn't take briefing in opposition to the defendants' motion for summary judgment on that issue — But didn't you — isn't it relevant that you raised that same issue in your own motion for summary judgment? Yeah, it is relevant. And that's why I'm saying it's not — we did say that it was not properly before the Court. And that may — I do think that that's correct. But the way the Court resolved this, it's really more of an evidentiary issue and a burden of proof issue where the Court looked to its own order denying the plaintiff's motion for summary judgment in which it correctly weighed all the facts and made all inferences in favor of Paysetter in denying plaintiff's motion for summary judgment, but then it adopted those same factual findings in the context of granting the motion for the defendant's summary judgment. And the North Miami v. DeSantis case from this Court explains very clearly that you can't ever do that. It has to be that even when it's cross motions for summary judgment as opposed to just motions for — you know, a motion for summary judgment, the rule remains that you're — that the Court is always bound to view the facts most favorably to the non-movement. To Judge Newsom's point, though, I don't — I don't know that I saw that argument in your brief either. Did you raise that in the opening brief? Yeah, I believe, yes. The focus was the notice, to be fair. But that was referenced also. Just so I'm — and you don't have to find it for us now, but I did — I don't think I saw that in the blue brief. I think I saw it appear in the gray brief, but I don't think I saw it in the blue brief. And I think the issue is — and it was raised also throughout the factual recitations in the opening brief where we talk about the fact that we are giving the factual recitation in the light most favorable to the plaintiffs because of the context of which the case comes to the Court, which is that the Court grant — this Court is reviewing a motion that — or, sorry, an order that granted the defense motion for summary judgment. So maybe on rebuttal, you could direct us to some page numbers where you think that you made that argument in the blue brief. Okay. I'm happy to do that. Thanks. But I — so I think that that's, you know, like I said, I think that that's one of the most important issues here because what happened was that the Court made legal findings premised on this faulty view of the facts. With regard to the cost issue, it found that the primary benefit of use — or of having to use the comprehensive employee transportation system was for the employees themselves because a lot of them didn't have cars. That's, as I read, the extent of the judge's — I'm sorry, the Court's — that I thought says, and you can tell me if that's not supported by the record, that they are — that they are agreeing to finance their own transportation. That's — well, and it gets to the core of the issue. So the agreement says that if they request — if they request transportation from Paycenter, then they're agreeing to pay for it. But they can get themselves to the job site any way they choose, right? No, they can't, and that's one of the issues. So the testimony, and there's a lot of evidence here, is that they can't do that, and that's a critical distinction between this case and some of the cases that Paycenter cites in its briefs. So they are not free. They have to go to the job — I'm sorry, they have to first report to the labor hall. They answer a simple question on a laptop — I'm sorry, on a tablet. Do you have a car? If you don't have a car, they assign you transportation either on — and this is — the majority of people go on a Paycenter-driven van that's branded on the side, Paycenter van, to the job sites. Or you can be assigned — if you say that you do have a car, then you're responsible for driving other people, and you're not allowed to go to the job site by yourself, typically. When you say typically, what does that mean? There's no evidence. There was — I think there was one person who said that one time he did, but generally that was an exception. The rule is that you can't do that, and they're not free to just leave. They then have to go to the tool room, collect the tools that Paycenter's clients have requested that they bring and required that they bring to do the work. For example, you know, if they're doing demolition, a pickaxe. If they're doing sweeping, a broom. And then they have to wait, because they've been assigned to this transportation by Paycenter. They have to take the Paycenter-assigned transportation. If they don't take that, or if they refuse to take it, or they don't take it, or they're not there when the transportation leaves, the job is revoked, and they don't work that day. So why — my understanding from the record is that workers acknowledge that they possess, quote, the following options, end quote, to choose from regarding transportation. One, the workers' own transportation. Two, public transportation. Three, transportation provided by Paycenter. Or four, transportation provided by a co-worker. Why do those options mean that the workers were required to use Paycenter transportation? On the face of the contract, I don't disagree that the contract says what it says. The issue here is the Court looked to that and did not look at any of the other evidence. And the evidence was, in practice, they don't actually have a meaningful option. They are assigned by Paycenter the required transportation that they have to take, and then they have to take the tools that are likewise assigned, that are requested and demanded by the clients of Paycenter. And if they don't take the instructions in the form of the daily time ticket along with the tools that are requested on the Paycenter-assigned transportation, they can't work at all. But do you — did you have any — or should I say, what was your evidence that some employee wished to get to the job site using different transportation and they were not allowed to? There's evidence in the record that there was instances where people were either assigned to drive in a car with someone that they didn't like, or they had personal hygiene issues, or they didn't want to go in the van because the van was sort of like gen pop and they had certain people that they didn't want to work with. And so — and they told Paycenter that they weren't going to, like, go that way. They weren't going to go in the van. Or they were not going to go in the vehicle of another person as assigned, and the job was revoked. Right. But did the person have another way to get there? That wasn't an option. That's the whole point, is that Paycenter said, well, if you don't take the van, then you don't do the job. This is a job — I guess that's my point, is Paycenter saying, if you don't have a way to get there, here's your option, is different than the person saying, here's my car, I would like to drive my car instead of riding with this person that I object to in their car. Do you have any example where the person actually had a way to get there and Paycenter said, no, you have to take this way? That's how the business always was. So it always was like that. Like what? You always — whether you had your own mode of transportation or not, Paycenter required a certain way that you do it. They're — In practice, but not in writing. I think that's my question with respect to this agreement, which I think you do have to concede the provisions are not necessarily in your favor. So are you saying that the district court erred by not focusing on the practice as opposed to what was in writing? Yes. I think they overlooked all of the evidence of what happened in practice and said, this is what it says in writing. And they accepted Paycenter's facts and they rejected the plaintiff's counter facts, virtually every single thing in this case. So what about those individuals who are using their own vehicles? And I'm really interested in whether Paycenter created a side transportation business, that they were making money off of these individuals, or is it really just their effort to make sure that their business model was successful, which is to essentially, you know, disperse these individuals to do these business or these jobs? Well, so in the context of the cost issue, I think that's a distinction without a difference because this is for Paycenters. This is the core of their business model, is that they're delivering the workers with the tools to the job sites. Right. But I'm asking — and maybe you're saying that it doesn't matter. Once they get to the job site, that's the money that Paycenter is getting and it's all combined. But I'm trying to figure out, are they making money off of these individuals through this transportation service, or is it really just a way to facilitate their real business, which is providing workers?  I misunderstood your question initially. So they are making money in two ways. They're making money mostly indirectly. So if someone rides on the van, which is a Paycenter van driven by a Paycenter van driver who is a Paycenter employee whose primary job is to drive people in the Paycenter van, those people are charged $3 a day. Paycenter then, instead of using their own money, they use that $3 in part or in whole to pay the van driver so that they would otherwise be paying the van driver, but now they're not paying the van driver because they're making the employees pay for the transportation themselves. And it's the same thing for — But don't employees always pay — I shouldn't say always — almost always pay to get themselves to their job? I mean, I pay my gas money to come to work, right? Well, the critical difference is here, in order to work, they had to go to the labor hall. But then they had to get the tools and the — you know, after they got an assignment, they still had to go to the tools and they still had to leave from the labor hall. They were not free to go from their homes the way that we all did before we got to court today. So coming from however anyone got from home to court today, that's ordinary commuting. The difference here is that people had already done that. All of the employees here had already commuted from their home or wherever they resided to the labor hall in the first instance, and then this is solely — this is for Paycenter's benefit because of the operation of their business. It's unique to their business that it had to be this way because of the collection of the work tickets and the collection of the tools, which then were both essential, integral and indispensable to the work that was being performed as assigned. They were then dispatched, and they always had to leave from the Paycenter labor hall. And that's the difference, you know, and the regulations are clear. When someone has to go to a meeting place, they got either instructions or tools, and it's either one, but here we have both. Before they can go to another job site, remote job site or another job site, that's not a normal commute. That renders the time traveling from the employer's business, headquarters — it's typically like an employer shop. Here it was sort of a storefront where they recruited people. I know you're running out of time, O'Rear, you've run out of time. I have a question about the class certification issue. It seems even from your brief, you've got over 300 individuals who formed the larger class, and then you had your request for the subclass of individuals related to this transportation issue. I could see how the district court might view it unwieldy to go behind each individual to find out why they were charged, why they weren't charged, there's something in the record about someone not being charged one day, then being charged $5 the next day, suggesting that it all works out in the end. Can you talk to me a little bit about why you still believe that that is a manageable class size? Sure. I think largely the court went out of its way to create issues that were not there. What we have here is basically a ledger where there's thousands of instances where someone was charged over $3 in a day for the daily transportation. And then in some of the entries in the ledger, it says this person bought three bus passes. So instead of $3, that's why they were charged $12. There's no evidence, and the only evidence that was produced by Paysetter in opposition to that, and what the court relied on was just generalized statements that people do, in fact, buy bus passes from Paysetter because they're discounted. None of that is in dispute. The issue really boils down to you can simply look at this ledger and you can see who was charged over $3 a day, and you can likewise see if there's some justification for something other than the daily transportation on the Comprehensive Employee Transportation System. It's noted in the records. But your class definition, and I hope I'm looking at the right thing, is DTWs that were charged over $3 on any given day for transportation. That does seem a bit broad, given the record shows some people were paid, some people weren't paid consistently, that kind of stuff. Again, the point is, as I understood the district court, that it would require too much of an individualized assessment to justify a class. So I think this is exactly like the Roper case that's cited in our brief from the former Fifth Circuit. It's true that you would have to look at — let me take a step back. The reason why the class is phrased like that is because we couldn't have it where we were automatically going to win. It couldn't be fail-proof where we said the class, if anyone was charged over $3 a day, you know, illegally, where there was no justification. So we labeled it as, you look at the list, you can look at the ledger, you can see every single instance where someone was charged over $3 a day. And it's really simple. It's just — it's exactly like the Roper case. On its face, this ledger shows you exactly who we're talking about. And that's why the Court didn't — the Court didn't have an issue with any of the Rule 23 issues. There wasn't an ascertainable — ascertainability issue, which is kind of what you're discussing, I think, Your Honor. The Court had no issue with that because it knew, you look at the records, we can see exactly who we're talking about here. And likewise, there was — the Court thought that there was some phantom issue about, well, how do we know that we don't need to take testimony from people to see if they did or they didn't. There is no evidence that anyone ever bought a bus pass or that any of these charges were anything other than for use of the comprehensive employee transportation system. There's just — there's no evidence. In fact, the only evidence here is when deposed, the corporate representative confirmed that nobody can possibly say that anything is for anything other than daily transportation unless the record itself indicates that it's for something other than the daily transportation. This is a perfect case for class certification. It's exactly like Roper, where it's really just a tabulation issue. And in Roper, the Court noted, yeah, you may have to have some people — you may have to have clerks look at these records. It's not, you know, maybe we can't just press a button. But if it's — you know, if you need to do that in conjunction with looking at the records and having someone just kind of figure out, is there an excuse here? Is there a justification there? Is there — how many — you know, how many times or which instances — is it over $3 in the left-hand column and in the right-hand column? Which instances is there some justification? And where there's no justification, there's necessarily a violation here based on the record. And that's why it was an abuse of discretion for the Court to find individualized issues. There simply are no individualized issues here. And I know it was somewhat confusing even to me as I read it. The idea of the debits and the credits, that was nothing that any of the parties raised. The Court raised that sua sponte, and frankly, it doesn't make any sense in the context of this case because these are daily ticket laborers. Even on page 2 of their brief, the defendants acknowledge that they're working for single days. There is no other record other than single-day records because nobody who's a daily ticket worker — they have other types of workers, but that's not who we're concerned with here. The daily ticket workers, their records are necessarily limited to single-day transactions. So for the Court to say, well, we don't know, one day it was $750, but another day it was no charge, that's a non-issue here. Because all we take from that is that on one day, someone clearly would be qualified for the class because they were charged $750, which is obviously more than $3. And another day, they would not have a claim because they were charged $0, and we don't know why that is. But really, it doesn't matter for purposes of class certification. Perfect. I think we've got it. We've let you go 11 minutes over. We were carrying you there for part of that time. So you've got your rebuttal time. Please do get us the citations from the blue brief if you can. Mr. Tomasi, you've got 15 minutes. Still morning. Good morning. May it please the Court, Ronald Tomasi here on behalf of the appellees. We're here today to request that the Court affirm, of course, the District Court's grant of summary judgment on the FLSA and FNWA claims as well. How much money are we talking about in terms of what the daily laborers were paid minus this transportation cost? And I want to know how much money are we talking about in terms of actual wages? And I ask because there is a reasonable argument that PayCenter was always going to make money even with charging this $3 for transportation, but the actual daily laborers are losing money. Thank you, Your Honor. I have a few responses to that. First, there's actually record evidence that PayCenter was actually losing money on this. This isn't a money-making scheme for them. This isn't any sort of revenue generator. In fact, the Florida Labor Pool Act specifically permits $1.50 transportation deduction for each way. And that's what PayCenter does. And I will note, more importantly, frankly, for this purpose, there's record testimony that a lot of, if not the majority, of those $1.50 charges were actually charges to compensate the driver who was taking their coworkers or co-commuting. That money doesn't go to PayCenter. That money goes to those drivers. So PayCenter doesn't get that money. That's just essentially an incentive to try to get these folks to carpool there, facilitate their ability to get there, and start working at the job site, which is where their job starts. They don't have to choose to take the PayCenter or any issue of transportation. I know that's been the representation, but there's volumes of evidence in the record. As Your Honor noted right out of the gate, first, it starts with the contract. The transportation agreement specifically says you have these options. But more importantly, the plaintiffs themselves have actually admitted to saying things like acknowledging that they took various methods of transportation. You have Martin Johnson, a particular plaintiff, saying that he took the van, he took the carpool option. But this is all once they get to the site, where they get there to PayCenter. So yeah, we're all responsible for how we get to work. But if we go somewhere from here to a meeting or conference, we get mileage, we get reimbursement for gas. That is understood to be within the bounds of fulfilling our job obligations. How is that different? Well, because that is necessary to the employment. And you're already on the clock at that point. In this case, these were considered as, under the FLSA, other facilities. And I want to take a step back, if I may. I would like to address the issue of whether this was properly addressed by the court, right? It was presented as a lack of notice issue. But regardless, frankly, that procedural argument is not really relevant here. It's a red herring, because obviously this Court is reviewing the legal findings, de novo, first of all. But more importantly, the plaintiffs themselves actually brought up on their affirmative motion the legal argument that these deductions were not other facilities as contemplated by the FLSA. They briefed it in their motion. They briefed it in their reply. So the argument now is, yeah, but because you didn't specify other facilities to PayCenter in your cross-motion for summary judgment, we don't get the factual inferences and benefits. That's not what was briefed, as far as I recall, in the opening brief. But regardless, it's really irrelevant, because first of all, there's been no argument made how the outcome would have been different had the facts been reviewed differently. But let's take a step back here. In that motion that was filed by the plaintiffs, where they're asking Judge Singal to conclude that these are not other facilities that could count towards wages, Judge Singal, despite there being the movement, actually gave them the assumption that all of this was required and mandatory, and that this was required by PayCenter, and that they had to take these $1.50 charge each way PayCenter issued transportation. So in fact, even as the movement, they got that benefit. They got that inference. And Judge Singal, nevertheless, correctly stated it doesn't matter. It does not matter, because I find as a matter of law that this is not for PayCenter's benefit. This is simply facilitating many of these folks who testify, by the way, that they don't have vehicles. They don't have a way to get to the job site. So PayCenter is charging them the FLPA-authorized $1.50 each way to facilitate their ability to get there. Because if they don't get there, they can't work. They can't get paid. But they get to PayCenter on their own, right? I mean, they get to the location where they then get the tools and the van and all of that. That's on their own, right? Well, getting to the labor hall, first of all, it's also important, I think, Your Honor, to remember the whole nature of this business. The whole nature of this business is voluntary from the beginning to the end. These daily ticket workers, and there's replete, the record is replete with this, they voluntarily choose what days to show up to the labor hall, if at all. They voluntarily, once they punch in or sign in, as Mr. Frisch noted, the login at the kiosk, a dispatcher will then announce whether there's a job that might fit them. And they have, at that point, the ability to take it or not. They have the, they don't. Yeah, no, that's not what's at issue. The issue of the Fair Labor Standards Act then requires, once they do, and Paysetter agrees to have them as a daily ticket worker, then there are regulations and laws that cover that. So the voluntariness of their decision, like all of us, to work, and that's, I don't think that's really relevant. And Judge Singal correctly addressed that issue, too, and still gave him the benefit of the doubt, saying, okay, fine, then it's required. But all that means is that it's akin to commuting time. I think, as Judge Grant actually analyzed it earlier, or at least brought up the question in that context, under the Portal to Portal Act, that's exactly how this is viewed. This is viewed as the time going from the labor hall, even, and Judge Singal correctly noted, even if there's some time waiting from when you get the job ticket to when you get to the job site, that is nothing more than preliminary, akin to under the FLSA, under the Portal to Portal Act, that is essentially nothing more than preliminary and post-preliminary activities exempt from the FLSA. And so this, all of this was properly considered by the Court, and in fact, to the extent there were inferences and deferrals on the facts, they were actually all afforded to the plaintiffs. And Judge Singal correctly noted, in relying on cases like Whitehead, by the way, which we cited, I know it's a North Carolina case, but the facts could not be more on point. Labor hall, voluntarily show up, wait to get the job ticket, get a job ticket, have to wait for transportation. The facts could not be more in line, and the Court in that case held exactly what Judge Singal did in this case, which was correct. I don't know that it matters necessarily for the outcome of the case, but I'm curious. Is the job hall cited in a place that is easier for these workers to get to? Do you know? There was really no inducement of evidence on that issue, Your Honor. But the fact is, again, a lot of these folks don't have transportation of their own or own vehicles. So by nature, most of the job sites are within a relatively, certainly commutable proximity to the job halls themselves. One other thing, unless the panel has another question on this issue, I'd like to address while I still have some time here, because I know that there was some discussion about the Judge Singal's declination of certification of that FLPA transportation class. Well, first of all, we still are of the position, of course, that individual liability and damages here predominate. While there may be some missing records, we don't, it's our view and we believe it's the correct view and it was certainly Judge Singal's view, that none of that at all is some sort of obviation of our, the pacemaker's legal right to prevent or introduce countervailing evidence of any individual DTW's use or purchase of bus passes, for instance. And two, and by the way, there was a representation that there's no evidence that somebody purchased bus passes that, I mean, that's belied straight by the facts in the briefing. I mean, page 11 of our brief, we cite to a plaintiff, Stanley, whose deposition, not only does he acknowledge that pace setter, like, or that he occasionally bought bus passes, but he acknowledged that pace setter would only charge $3 for that when it was a $5 market value. And to use his terms, he thought that was pretty nice. So this is all, again, all of this is in furtherance of facilitating their ability to work. But back to the certification issue, so our view is we retain the ability to challenge on an individual basis, especially when we have record evidence, that folks were buying bus passes and doing so for their personal use, by the way, because these are bus passes that were not only used exclusively to, in furtherance of going to a job site, these are passes they could use even on different days for personal use after they left the job site to run personal errands, et cetera. Also, just as a matter of procedure, I'm not even sure the panel needs to reach this issue because if the panel recalls, the posture of this particular FLPA claim was after pace setter successfully obtained some re-judgment on the Labor Act, the FLSA, excuse me, and the Minimum Wage Act claims, the court asked the parties, should I retain supplemental jurisdiction over what is now uncertified individual state law claims? And at first, the parties jointly said, yes, we encourage you to do so. About a week or so later, plaintiffs about-faced and said, you know what? Upon further reflection, no, we think you should relinquish and dismiss. So the court, and we briefed and we maintained our position that for matters of efficiency alone, because we were on the cusp of trial, that, you know, all the discoveries done were closed, we're ready to go to trial, let's just try these issues, please, you know, exercise and retain supplemental jurisdiction. Well, the court at that point, and they replied in support of their argument to relinquish, Judge Singal agreed with them and said, okay, I am not going to exercise anymore. I'm dismissing this. I'm dismissing it without prejudice. This claim is now gone. They didn't challenge dismissal. So if they haven't, of course, they couldn't because it would be an invited issue, I suppose, but I'm standing before the court and I'm wondering, does the court even need to reach that issue because it's been dismissed? You know, a cardinal principle, of course, of judicial restraint is that it's not necessary, if it's not necessary to decide more to dispose of a case, it's necessary not to decide more. So in this case, I'm not even sure what it looks like. Does it get sent back to Judge Singal when he's already said, I'm not going to exercise jurisdiction over this? And that's never been challenged. Can you be really specific about what you're saying we shouldn't decide in light of the class certification decision? I'm sorry? Can you be really specific about what you're saying we shouldn't decide? I've heard a lot of this, but I want to know what this is. My point is, Judge Singal has already decided, I don't have jurisdiction, or I'm not going to exercise jurisdiction over this. Right, but what is this? Over the FLPA claims, which is the only claim that they're saying that he should have certified. But they have not challenged that. There's nothing in the briefing, of course, about that. And our position would be that they couldn't take that position because they asked the court to relinquish that jurisdiction. And then in terms of just a few other points, as I noted, they briefed the specific legal issue of whether the deductions constituted other facilities and were therefore legal under the FLSA or not. So they've got the benefit of that. That issue was squarely presented. The court concluded as a matter of law, giving them the inferences and the benefits of the doubt that everything they alleged was required was, in fact, required. Notwithstanding that, the court correctly held that this was really just a way to facilitate, as contemplated by that language, their ability, the DTS's ability, to reach the job site where they could then work, also for what it's worth, as Judge Singal noted in his order granting our motion for summary judgment. He said pay, set, or seek summary judgment on all claims. Of course, encompassed within that is their claim that this issue was not constituting other facilities under the FLSA. Okay. I think I misunderstood what you said because it sounds like you're saying they forfeited or waived an argument on appeal. And I just want to make sure you're not talking about Section 4 of their brief where they talk about the class, subclass issue. You're talking about something else related to class? Well, no. What I'm saying is they're only seeking the certification of the transportation subclass, which, again, in and of itself, you know, they sought all the classes, they're now seeking one subclass, I guess, saying that that subclass should have been certified. But the claims themselves, the overarching claims, the Florida Labor Pool Act claims, Okay. Judge Singall has said, I'm not, because those are standalone, and so in other words, if you affirm the motions for summary judgment granted in our favor, and the FLSA and FMWA claims go away, and all that you're left with is the, or all that's left is the FLPA claim, Judge Singall has already said I'm not hearing that. I'm not. I'm, you know, I'm dismissing it without prejudice at your, at now Appellant's invitation to do so. So you're saying they would have a class but no claim? Exactly.  But wasn't, I assume that their request was based on the fact that the class certification was denied. So that if we disagreed with the district court about the class certification, then that claim would come alive again, right? I don't necessarily agree with that. Because it's still, there still has to be an independent basis to assert a standalone state claim. And they've, and they've argued now that there is no such jurisdiction to do that. Okay. Okay. Very well. Thank you so much. Thank you very much. Happy Holidays. Happy Holidays. Mr. Frisch, you've got five minutes remaining. Thank you, Your Honor. Just to finish, starting where you finished off, I think Judge Grant raised the correct issue regarding the Rule 23 certification issue. The issue is that there was no CAFA jurisdiction after the Court decertified the other Rule 23 class that he had previously certified. And by not certifying this class, there was no Federal court jurisdiction. It was just pendant jurisdiction. Obviously, if this Court reverses the Rule 23 certification, the Court would have CAFA jurisdiction, which currently was lacking, and that was the basis of the Court's dismissal in the first place. Answering your question, Judge Newsom, I don't see argument in the initial briefing about the Rule 56 standard. Obviously, it's well known it's a Federal rule of civil procedure, and this Court is well aware of what the standards are. I think regardless of whether it's raised as an argument, either way, the Court has de novo review over summary judgment, and in doing the de novo review, it's important that the Court apply the correct standard, which was not applied by the district court. And I'm just going to point out some critical facts that were construed against the plaintiffs in the context of the defendant's motion that any one of them would change the results here with regard to both of the issues that were appealing on summary judgment. With regard to the travel time and pre-travel time transportation, there was abundant record evidence that you had to report to the labor hall each day if you wanted to work. So on every work day that we're talking about, you couldn't just go from home. You had to go to the labor hall. You had to use the comprehensive employee transportation system. And I know they say, oh, you know, it's voluntary and they did produce the contract, but that's hotly debated.  Well, I think what they say is Judge Singal said, fine, it's required, but in any event, as a matter of law. I think what they said was in the context of another issue. I know it's confusing because they're sort of related, but then this idea about, because you had to take it, that impacts, and you also had to get the tools. You had to be there for the waiting time. You couldn't leave. You couldn't use that time for your own benefit. That's an issue of fact, just like the Preston case, which is exactly like this case. The Court said, well, this issue of voluntary using their transportation or not, that's going to impact whether or not it's integral and indispensable. And therefore, summary judgment has to be denied. There's issues of fact because it's in dispute whether they had to take it and whether it's part and parcel of being delivered to the job site. Is that their business? And we say, obviously, that it is. They say that it is, too, by the way. My friend on the other side of the aisle said that the Whitehead case was directly on all That's incorrect. In Whitehead, after getting the job, the employees themselves elected however they wanted to go to the job site, and they were free to leave the labor hall whenever they wanted. There was no reference to anyone having to pick up tools or carry tools from a tool room. There's no, and they didn't restrict the mode or any activities. Once you got a job ticket, the only thing in Whitehead was you just had to be at the job site by the time the ticket said. That's not at all anything similar to what we have here. And as I said also, for the transportation time claim, there was no tools, and that's critical because there's a regulation, as you're all aware from the briefing, directly on point. If you have to go to a meeting place and you have to get tools, which then you have to carry to the job site, that by itself makes the time integral and indispensable work to the work that you're performing, and it makes it compensable. Those facts were not present in Whitehead, and it's a clear distinguishing factor. On the cost issue, I just want to point out the Montoya case. I think one of the reasons why the defendant didn't move for summary judgment on the cost issue is because the law is so clearly in favor of the employees. There's the Arriaga case from this court. That case was, I think it's worth talking about the facts, and I know I'm about to be at time, but in Arriaga, it concerned migrant employees coming from Mexico, and they had to pay for the cost of coming to do their jobs as farm, seasonal farm workers. When they got, then they would get their first paycheck, and they weren't reimbursed. They weren't using the employer's transportation to come. They were just having to pay to be able to work for their convenience, because if they, obviously, if they didn't pay the transportation, they wouldn't be in the United States. They couldn't go to do the work. I have one quick question. If we decide that the $3 paysetter charges is okay, does that undermine your argument, which I thought was also on appeal, that they should nevertheless be paid from the time that they're on the van or transporting themselves from the hall to the actual construction site? Well, in order to find, that's a good, sort of, but not necessarily. The $3 claim is governed by a task which says, are they coming from, in order to be other facilities, they have to, one, be coming, the transportation has to be home to work. That's not what we have here. So, for that reason alone, the other, it's not another facility. It also has to be necessary and integral to the work. That factor, which we say it is, or, sorry, it says it can't be necessarily integral to the work. We say that it is. That has implications under both tests, and I'm forgetting, I apologize, what the third thing is. But, to answer your question, they sort of have an interrelationship, but they're not necessarily the same. And one last thing, I just wanted to point out the Montoya case, which is not distinguished in the papers. In Montoya, just like here, it concerned domestic employees who had to report to their first day of work, just like here. They had to go to a work site of the employer where they then were, they took transportation that was arranged by the employer, just like here, to a site where they had to go for orientation. And the court said that that is, even though, obviously, you know, the employees benefit from the orientation, and they benefit from being able to work, that is primarily for the benefit of the employer and not the employees. Montoya is indistinguishable from these facts. That went up to the First Circuit. The First Circuit affirmed it, and I think that's clearly at odds with, so we'd basically be creating a circuit split here if you were to find that they could charge these costs, aside from the fact that Arriaga is, in Arriaga, that they were coming from the employer. I think we've got it. Okay. I don't think we need to circle back to Arriaga. Okay. I appreciate it very much. Thank you both for your presentations. That case is submitted. We'll be in recess until tomorrow morning at 1030. All rise. Thank you.